## BRONSON and CROCKER *against* WIMAN.

In an action by the vendee upon a contract for the sale of an article to be delivered at a particular place, if he show he was ready to pay at the time and place appointed, it is not necessary for him to prove payment or tender.

If the payment was to be in "New York funds," and it is shown that the vendee had means to pay them, there is no necessity of showing that he had obtained such funds for the purpose.

If a vendor is not induced to enter into a contract by false representations of the vendee, the fact that the latter made such representations during the negotiation of the contract, will not avoid it.

Where there is an attempt to impeach the good faith of a vendee in obtaining a contract of sale on the ground of fraudulent suppression of information obtained from a letter, he may show the contents of the letter to repel the presumption of fraud.

Where one alleges fraud in a contract of sale, his declarations made subsequently may be proved to show his affirmance of the contract with full knowledge of the facts.

This action was brought upon a contract in writing entered into October 16, 1845, at Oswego, by which the defendant sold the plaintiffs two thousand barrels of superfine flour, to be the first shipment from his mill, and to be delivered in Troy or Albany, as the plaintiffs should direct, at $4·94 per barrel, to be paid for in New York funds. It was tried before Mr. Justice GRIDLEY, and a jury, at the Oswego circuit, in February, 1850. The plaintiffs proved the making of the agreement: a direction to the defendant on the 20th of October, and another on the 21st of November, 1845, to deliver the flour at Albany, to J. K. Wing: that Wing had notice and a copy of the contract: that he was prepared to pay for the flour when received, and had facilities for raising money to any amount he pleased, and sufficient to pay for two thousand barrels of flour: that the defendant, between the 21st and 25th of October, shipped from his mill over two thousand barrels of flour: that such flour arrived in Albany in about ten days after shipment,

Bronson *against* Wiman.

and flour was rising in Albany from October 25, when it was worth $5·50 per barrel, to November 5, when it sold for $6·25. The plaintiffs then rested.

The defendant thereupon moved the court to nonsuit the plaintiffs, on the ground that they had not shown payment or performance, or any tender of payment or performance of the contract on their part; and also on the ground that they had not shown that they or Wing were ready to pay for the flour in question, or had or could get the New York funds required by the contract to pay for the flour in Albany or elsewhere.

The court denied the motion, and ruled that the evidence was sufficient to go to the jury, and the defendant excepted.

The defendant then proved that on the morning of the 16th of October, 1845, news arrived, that the British steamer Great Britain had been seen off Nantucket: that on the same morning after the arrival of this news, and at about eight o'clock, one Tomlinson arrived at Oswego with knowledge that the steamer brought news of a rise of flour in England, which had been obtained from the steamer and brought by express, and communicated the same to the plaintiff Crocker, who at his instance went out among the millers at Oswego and made several contracts for the purchase of flour, in which the plaintiffs were to have one-third of the profits, Tomlinson one-third, and Wing one-third. Among the contracts was the one in question. In negotiating it the plaintiff Crocker told the defendant he had an order from the east, (holding a paper like a letter in his hand,) to purchase from 1000 to 2000 barrels of flour, and wanted to get the defendant's lowest offer for the flour delivered in Albany. Defendant asked him if he had any further news by the steamer Great Britain, and he replied the only news he had was by the papers. When the defendant said, " If you have not any news, or any news more than I have, I will make you an offer." The offer was then made by the defendant, and Crocker left,

and in forty or fifty minutes the plaintiffs' clerk returned to accept the offer, and reduce the contract to writing. When the clerk had written the contract the defendant hesitated about signing it, and said he believed they had some news more than he had. The clerk replied that he did not know any thing about any news. All he knew about it was what Crocker told him, to come over and close the contract. The defendant finally said if they had no more news than he had, he would sign the contract, and did, and delivered it to the clerk. The defendant also proved that on the 18th of October, 1845, the plaintiffs in a letter to their correspondents in New York, in the hand writing of Crocker, wrote as follows:

"We had the English news here one forenoon to ourselves, and were wicked enough to use it on our unsuspecting neighbors moderately, but as the circumstances under which we obtained it obliged us to divide the profits and consign it to others than our ordinary correspondents, we did not buy as much as our consciences would possibly have allowed if we had been alone, or acted with some of our friends. We thought it fair to take 2000 barrels of Wiman, [the defendant,] and a little from some of the other millers."

The defendant then rested, and the plaintiffs proposed to show a letter from Wing to Tomlinson which furnished him the information he had. The defendant objected to its production, but the justice admitted it, and the defendant excepted. It was as follows:

ALBANY, Oct. 15, 1845.

Mr. J. H. TOMLINSON,

Dear Sir: *The steamer is in and the flour market all excitement; flour is bought at $5 quick, it will go to $5·25, I think.* I write by an express. Buy all the flour you can get hold of, not to cost here over $5, and first rate wheat not to cost over 8-6 here, and do as much better as you can. Sale of wheat to arrive at 8-8 this day. If you can get hold of any wheat and flour before the news is generally

known, I would do it at once on joint account. I would not operate to cost here over $5 for good Genesee flour, and wheat to cost over 8-6. More to-night.

Truly yours,  J. K. WING,

Pr. J. H. Chipman.

The plaintiffs also proposed to show the declarations of the defendant made that evening in the plaintiffs' office, showing that he then knew what the steamer's news was, and also what the information was which Crocker possessed, and that knowing that, he said he was satisfied with this contract; and also declarations showing that he reaffirmed the contract with such knowledge.

The counsel for the defendant objected to the admission of this evidence, on the ground that the plaintiffs were not present at the interview, and also that the bargain or contract could not be confirmed by parol. It should have been in writing.

The court decided that the evidence of such declarations of the defendant was admissible to go to the jury, and that, at all events, it was admissible as tending to show that he was not deceived by the false representations of the plaintiff Crocker, and did not rely upon them in entering into the contract to sell the flour. The defendant excepted to the ruling. It was then proved that defendant came in the plaintiffs' office a little before seven o'clock in the evening, and Mr. Crocker came in five or six minutes afterwards: that nothing was said about the news: defendant said to Crocker in a laughing way, "Why, Crocker, they say that you have shaved me." Crocker said he did not know. They conversed some time with each other, when the defendant remarked that he was satisfied with his bargain, for he was sure of making one dollar a barrel and the plaintiffs were not sure of making any thing This was after the arrival of the news by the Great Britain, which reached Oswego at four o'clock in the afternoon.

Sel. IV.—24.

The evidence being closed, the justice charged the jury as follows:

I. The first question is, whether the plaintiffs were ready and prepared to pay for the flour on delivery. The flour was to be delivered to Wing in Albany, and there was no certain time provided for its delivery. The evidence was then read to the jury, and the question submitted to them, whether there was evidence that the funds were ready, the justice observing that if Wing had the money, he could easily have purchased a New York draft, thus turning it into New York funds to meet the contract.

II. The next question was, whether the plaintiffs were guilty of fraud in making the contract.

III. The next question was, whether the defendant was deceived and defrauded, and entered into the contract relying on the representations of Mr. Crocker: for if he was *not defrauded,* but made the contract without reference to those representations, then the defendant ought not to succeed: that ordinarily it would be enough to prove the fraudulent representations, and the inference would follow that the defendant was influenced by them. But in this case it might not be so, and he proceeded to state and comment on the evidence, showing the difference between the cases in which such an inference would be an almost certain conclusion from the evidence, and this case—alluding to the defendant's declarations that evening on which the contract was made, to the effect that he was satisfied with the contract—that he was sure of making a dollar a barrel, and that Mr. Crocker was not sure of making any thing; and submitting to the jury whether, admitting that Crocker's representations were fraudulent, Wiman gave credit to, and was influenced by them in making the contract.

IV. He then submitted to the jury that, if they found the representations fraudulent, and that Wiman was influenced by them in making the contract, whether there was a reaffirmation of the contract afterwards by Wiman with a notice of the fraud: and he instructed the jury that if

Bronson *against* Wiman.

they believed that Wiman, after receiving information of the arrival of the steamer, and the rise in the price of flour, and when he had either knowledge, or fair notice, or fair reason to believe that he had been deceived, then re-affirmed the contract, he would be bound by such reaffirm-ance. For, by such reaffirmance, the plaintiffs would be bound to provide funds to pay for the flour in Albany, on its delivery there, which, if Wiman had at once disaffirmed the contract, no such necessity would have existed; but they must be satisfied that Wiman intended to reaffirm it.

The counsel for the defendant excepted to the first branch of the charge, upon the ground that there was no evidence that the plaintiffs were ready and prepared with New York funds to pay for the flour; and to the last branch for the reason that there was no evidence to show that the defendant, though he knew of the rise in the prices, was aware that Crocker had deceived him.

The justice then put to the jury these specific questions for them to answer in writing, as follows, viz:

If you find in favor of the plaintiffs then you will state whether you find,

1. That Crocker's representations were fraudulent.

2. If so, whether Wiman was actually deceived and induced to sell by means of such representations, or whether he sold independently of those representations, not influenced by them.

3. If you find that Wiman was actually deceived and defrauded, then whether he reaffirmed the contract afterwards with a knowledge or fair notice of the fraudulent character of those representations.

The jury rendered a general verdict for $1,433·60, and a verdict in writing as follows:

" We say that the defendant was not deceived, but acted independently."

Judgment was entered upon the verdict, which was affirmed at a general term of the supreme court held in the

fifth district in January, 1851. · The defendant appealed therefrom.

*D. H. Marsh* for appellant.

*H. Denio* for respondents.

GARDINER, J. The motion for a nonsuit was properly overruled. The first ground suggested was clearly untenable. The plaintiffs were under no obligation to prove payment, or a tender of payment; it was enough that they were ready at the time and place appointed for the performance of the contract to receive and pay for the flour. (1 *Hill*, 523.)

The second reason assigned by the defendant in support of the motion was, that the plaintiffs had not shown that they or Wing were ready to pay for the flour in question; or that they had or could get New York funds for that purpose, at Albany or elsewhere.

As the proof then stood, the plaintiffs had directed the defendant, in pursuance of the contract, to deliver the flour to Wing, the consignee at Albany, and informed him that he would advance the price upon delivery. Wing was apprised of the agreement, and furnished with a copy, and he declared to his clerk that he was ready to pay for the flour if it arrived, and in confirmation of this declaration it was shown that he paid promptly all demands against him, and that he had facilities for raising money to any amount, sufficient to pay for 2000 barrels of flour This evidence was abundantly sufficient to take this question to the jury, and to authorize a finding in behalf of the plaintiffs. If the consignee was ready and able to perform the contract, we may presume that New York funds, or their equivalent, could be obtained at the capital of the state to an amount sufficient to pay for 2000 barrels of flour.

The second, sixth and seventh points, in relation to fraud

Bronson *against* Wiman.

of the plaintiffs, and its effect upon an executory contract, are all disposed of by the response of the jury, that the defendant was not induced to sell in consequence of the representations of the plaintiffs, but that he sold independently of those representations, and uninfluenced by them.

The letter written by Wing to Tomlinson was properly received in evidence. The defendant had proved, on the cross examination of E. T. Bronson, the letter Wing had written to Tomlinson, and that Crocker had communicated to him its contents, to some extent; and that the witness did not tell the defendant when about to consummate the bargain, because it would not aid him in closing the contract. This evidence was designed to raise the presumption that the letter in question contained important information, which was fraudulently withheld from the defendant. The letter itself would show precisely the nature and extent of that information, and was therefore properly received in evidence.

Another objection made is, that the court erred in receiving and submitting to the jury the declarations of the defendant that he was satisfied with his bargain; that he made one dollar a barrel by the sale, and that the vendees were not certain of making any thing. There is no just ground for this exception. The declaration was made after the news brought by the steamer was matter of notoriety, and had unquestionably come to the knowledge of the defendant. Under these circumstances the statement of a party (who alleged fraud upon the part of the plaintiffs as an excuse for not performing his contract,) in reference to the sale embodying it may be well supposed, his own views in reference to the transaction were certainly competent evidence. Of its weight and effect the jury were the exclusive judges.

I think the judgment of the supreme court should be affirmed.

Judgment affirmed